FARMERS STATE BANK, Plaintiff-Appellant, *v.* GEORGE WEBEL, d/b/a Webel Feed Mill, Defendant-Appellee.

Fourth District   No. 4—82—0468

Opinion filed February 23, 1983.—Modified on denial of rehearing April 6, 1983.

Jonathan H. Barnard and Mark A. Drummond, both of Schmiedeskamp, Robertson, House, Neu & Mitchell, of Quincy, for appellant.

R. P. O'Connell, of Quincy, and William E. Lowry, of Pittsfield, for appellee.

PRESIDING JUSTICE WEBBER delivered the opinion of the court:

Plaintiff sued defendant in the circuit court of Pike County for the conversion of collateral said to be subject to its security interest. A jury trial was convened on the matter and at the close of the plaintiff's evidence, the trial court directed a verdict in favor of the defendant. Plaintiff appeals and we affirm.

There are three principal parties involved in the dispute: the plaintiff-creditor, Farmers State Bank, Pittsfield, Illinois (Bank); the debtor, Pigs Unlimited, Inc. (Pigs); and the defendant, George Webel, d/b/a Webel Feed Mill (Webel).

Pigs' basic business was that of buying and selling "feeder pigs"; incidentally, it sometimes fattened them as described below. The "feeder pig" enterprise consisted of purchasing newly weaned pigs and bringing them up to an average of about 120 to 130 pounds. They would then be sold to purchasers who would make such disposition of them as they chose. During its existence, Pigs sold to the public approximately 72,000 feeder pigs. It was licensed by the Department of Agriculture of Illinois as a feeder swine dealer. The original base of operations was on a farm in Pike County; later it leased two facilities

on farms located in Hancock County and two facilities in Schuyler County.

In the fattening operation the pigs were retained and brought up to a "market" weight of 200-250 pounds and then sold to packing houses, such as Swift & Company, which was joined as an original defendant but dismissed by the Bank prior to trial. This would occur when, apparently because of market conditions, a feeder pig would remain unsold and exceed the weight of 120 to 130 pounds. It would then be retained, fattened to market weight, and sold to a packing house. This constituted about 5% of Pigs' operation.

Pigs entered into financing arrangements with the Bank. During the period from September 1975 to November 1976 it furnished the Bank with 21 notes totaling approximately $800,000. It was understood that the line of credit was $100,000 maximum, against which Pigs would draw from time to time, evidenced by short term notes. The proceeds of sale were to be deposited by Pigs in the Bank and the record contains no indication that this was not done. In fact, about $3,700,000 was so deposited. Also, from time to time as notes became due, they would be renewed upon payment of the accrued interest.

In connection with the loans the Bank took two security agreements and filed financing statements based thereon in each of the three counties in which Pigs conducted operations. A summary of the financing statements is as follows:

> Filed March 29, 1976, for the "Pittsfield" location in Pike County—"1200 head mixed pigs averaging 90 lbs. (90-150 range) located on farm land situated 7 miles west of Pittsfield and owned by Donald Sperry and Dave Doerring, running along route 54 and any and all livestock acquired hereafter.

> The above security is to cover all indebtedness either now or any in the future dating from January 19, 1976."

> Filed June 16, 1976, for the "Pittsfield" location Pike County—"1280 head hogs located on land owned by Donald Sperry located in South East Quarter of Section 31, Township 5, South Range 4 West Pike County, Illinois."

> Filed June 16, 1976, for the "Carthage" (Sutton & Whitcomb land) and "Dallas City" (Rohn land) located in Hancock County. "1070 head hogs located in Hancock County on the following tracts of land: land belonging to Don Rohn located in the Southwest Quarter, Section 3, Twp 7, North Range 6W; Paul Sutton in NE 1/4, Sec. 26, 5N, 6W & SE 1/4, 5N, 6W Sect. 26;

Ron Whitcomb—SE 1/4 Sect. 34, 5N, 7W. All the above property is located in Hancock County and belonging to respectively above named persons."

Filed June 16, 1976. The Bank claims that this filing covers livestock in the "Camden" location on land 8 miles away and that described here in which is owned by a man named Eck. "1000 head hogs located on land belong to J. W. Byers located in Schuyler County SE 1/4, Sec. 9, 2N, 9W."

One of Pigs' customers was defendant Webel, who owned and operated a feed mill at Pittsfield. From time to time Webel purchased feeder pigs and either placed them on his own farm for fattening for market, or on the farms of others with whom he had a fattening arrangement.

In addition to purchasing feeder pigs, Webel also entered into a special fattening arrangement with Pigs. The nature of this arrangement was such that Webel would pay Pigs for a number of feeder pigs which were either already located on one of the above lots controlled by it, had been purchased by Pigs but had not yet arrived, or were then obtained and delivered to one of the lots of Pigs. Feeder pigs were bought COD and most of the time they were sold, and the money deposited, before they arrived. Not more than 25% of the pigs Webel purchased would have already been in Pigs' lots. Its records would not differentiate among the pigs.

Webel would provide the feed for the pigs. Pigs provided the facilities, the day-to-day care, and would decide when to take the hogs to market. Upon receipt of the settlement check, Pigs would bring it to Webel, who would deduct out the original price advanced, the feed cost, and any profit would be split between Webel and Pigs. Any loss would be born by Webel.

Under this arrangement Webel did not remove the animals from the premises. Webel's records did indicate how many and in which pens his pigs were located among the Pigs' facilities. Webel had no security agreement, or any written agreement concerning this arrangement. He did not investigate to see whether or not anyone else did. He posted no signs or other notice to the public at large concerning his interest, nor were the pigs identified to the public as being Webel's property. By March 8, 1977, all of the pigs located in Pigs' lots in Pike, Hancock and Schuyler Counties were the subject of this fattening arrangement and as such, Webel claimed they belonged to him.

By February 1977 it became apparent that Pigs was in serious financial trouble. Officials of the Bank conferred with the principals of

Pigs, who gave them a verified inventory of all pigs located at any of the lots including weights, numbers, and approximate values. In fact, all of such pigs were subject to the fattening arrangement with Webel. Based on its further investigations, the Bank determined to call the loan and foreclose the collateral. After about a week of unsuccessful attempts to obtain the cooperation of Pigs' principals, the Bank on March 8, 1977, went to the Pittsfield location to pick up the livestock. The Bank's personnel were met by agents of Webel who blocked their attempts; Webel's agents then took all of the pigs located at Pittsfield, as well as the other locations, about 1,500 in number, and subsequently sold them for approximately $103,000. The Bank claimed that the incident on March 8 was its first knowledge of any claim of ownership by Webel.

The Bank then filed the instant suit on November 8, 1977. It alleged its security agreements and the filing of financial statements, as above described; it further alleged that the debtor, Pigs, agreed not to transfer without the Bank's consent any interest in the collateral; and that Webel had seized the collateral, as above described.

After a great deal of preliminary skirmishing, including several motions for summary judgment, Webel was required to answer. This he did on March 17, 1981. It was in substance a general denial and with it he filed two affirmative defenses. The first in effect pleaded waiver; *i.e.,* that the Bank never enforced its right under the security agreements to require Pigs to obtain authorization to make sales of the livestock covered by the agreements. The second setup that the livestock in the hands of Pigs was "inventory" and not "farm products" and that Webel was a "buyer in the ordinary course of business" within the meaning of the Uniform Commercial Code. Ill. Rev. Stat. 1975, ch. 26, pars. 9—109, 1—201(9).

At the conclusion of the plaintiff's evidence, Webel argued strongly for a directed verdict. His first ground was that it had been established by the evidence that he was a buyer of inventory in the ordinary course of business and therefore he took free of the Bank's security interest under section 9—307(1) of the Uniform Commercial Code (UCC). (Ill. Rev. Stat. 1979, ch. 26, par.9—307(1).) He further argued that the security agreements did not cover after-acquired property and that the security agreement on the "Camden" location contained a misdescription.

As has been indicated, the trial court granted the motion. Upon being pressed by the Bank to articulate its reasons, the trial court declined and commented only that the security agreements were "not valid."

While we do not agree with the trial court that the security agreements were invalid, the question on appeal is always whether its judgment is justified in the law for any reason or ground appearing in the record, irrespective of the trial court's assigned reasons. *Harrison v. Kamp* (1946), 395 Ill. 11, 69 N.E.2d 261.

In our opinion the record fully sustains Webel's contention that he was a buyer in the ordinary course of business and not a buyer of farm products.

The question is controlled by various sections of article 9 of the Uniform Commercial Code—Secured Transactions. (Ill. Rev. Stat. 1979, ch. 26, par. 9—101 *et seq.*) Most significant is section 9—307(1) which provides:

"A buyer in ordinary course of business (subsection (9) of Section 1—201) other than a person buying farm products from a person engaged in farming operations takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence." Ill. Rev. Stat. 1979, ch. 26, par. 9—307(1).

Definitions are provided by section 9—109:

"Goods are

* * *

(3) 'farm products' if they are crops or livestock or supplies used or produced in farming operations or if they are products of crops or livestock in their unmanufactured states (such as ginned cotton, wool-clip, maple syrup, milk and eggs), and if they are in the possession of a debtor engaged in raising, fattening, grazing or other farming operations. If goods are farm products they are neither equipment nor inventory;

(4) 'inventory' if they are held by a person who holds them for sale or lease or to be furnished under contracts of service or if he has so furnished them, or if they are raw materials, work in process or materials used or consumed in a business. Inventory of a person is not to be classified as his equipment." Ill. Rev. Stat. 1979, ch. 26, par. 9—109(3), (4).

Part of the Comment to section 9—109 states:

"When crops or livestock or their products come into the possession of a person not engaged in farming operations they cease to be 'farm products'. If they come into the possession of a marketing agency for sale or distribution or of a manufacturer or processor as raw materials, they become inventory." Ill. Ann. Stat., ch. 26, par. 9—109, Uniform Commercial Code Comment, at 83 (Smith-Hurd 1974).

■ In our judgment Pigs was a marketing agency within the meaning of the Comment and was selling inventory and not farm products. The question is somewhat clouded by the fact that Pigs also engaged in fattening operations. However, the record shows that this was at most incidental to the marketing operation and came about only because some of its inventory (feeder pigs) was unsold and the only feasible disposition was to fatten and market. The record does not sustain any contention that Pigs intended this result but rather it came about from market conditions beyond its control. As to the arrangement with Webel, the record is plain that Pigs sold inventory to him; he purchased feeder pigs; and at that point under section 9—307(1) he took free of the Bank's security interest.

■ Webel fits squarely within the definition of a buyer in the ordinary course of business referred to in section 9—307(1). Section 1—201(9) therein incorporated provides:

" 'Buyer in ordinary course of business' means a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind but does not include a pawnbroker. All persons who sell minerals or the like (including oil and gas) at wellhead or minehead shall be deemed to be persons in the business of selling goods of that kind. 'Buying' may be for cash or by exchange of other property or on secured or unsecured credit and includes receiving goods or documents of title under a pre-existing contract for sale but does not include a transfer in bulk or as security for or in total or partial satisfaction of a money debt." Ill. Rev. Stat. 1979, ch. 26, par. 1—201(9).

No argument is made that Webel had actual knowledge of the Bank's security interest; neither is it contended that he did not pay for the feeder pigs, or that the sale was in bulk. It is argued that Webel had constructive knowledge by reason of his joint venture with Pigs. Such an argument ignores that plain language of section 9—307(1) which protects a buyer in ordinary course, even though he knows of the existence of a perfected security interest.

The Bank has made several subsidiary arguments which require brief mention. It contends that since Webel did not take possession of the pigs, he cannot be a buyer in the ordinary course of business. Initially, it may be questioned whether the record bears out the contention that he did not take possession. It is clear that he furnished feed to the locations while Pigs had the day-to-day care of the animals; it

would appear to be a joint possession. However, we do not deem possession to be the controlling factor. A similar argument was rejected in *Herman v. First Farmers State Bank* (1979), 73 Ill. App. 3d 475, 392 N.E.2d 344. In that case the plaintiff purchased fertilizer and left it with the debtor to be delivered and applied at a later date. The creditor attempted to include it under its security interest and argued that no sale had taken place since delivery had not been made; therefore, plaintiff was not a buyer in the ordinary course of business. The court, after citing a comment to section 9—101, stated:

> "We do not think the technical passage-of-title rules under article 2 should be applied to defeat the plaintiff's claim in this case. Rather, we believe the focus in a case such as this should be on the 'ordinary course of business' requirement of section 9—307. \*\*\*. The transaction between plaintiff and Newell was customary in the business, and plaintiff had purchased solution from Newell on the same basis in earlier years." 73 Ill. App. 3d 475, 479, 392 N.E.2d 344, 346.

We agree with this rationale, and the record here shows that Webel had fattening arrangements with numerous farmers in the area over a period of several years and with Pigs for over a year. It is less clear that such arrangements were a common practice in the area but by the same token there is no evidence to negate the proposition.

Next, the Bank contends that the arrangement between Pigs and Webel was a consignment and subject to the consignment provisions of the Uniform Commercial Code. While the pleadings below raised such a theory, it was not strongly urged as an alternative to the principal one. We have examined the theory as expounded in the briefs of the parties and find it to be without merit.

Thirdly, the Bank makes certain arguments in the realm of public policy, *viz.*, a more favored status for inventory lenders. We feel that these are adequately answered in the following quotation from *Herman:*

> "Finally, defendant contends that a holding in favor of plaintiff would make the entire concept of security on inventory unworkable, placing on any inventory security holder the impossible burden of accounting to numerous unknown creditors of the dealer who had made payments on account, but never received their goods. This contention is without merit. The same argument was raised in both *Chrysler* and *Rex Financial,* and the courts firmly responded:
>
> > 'If there is a usage of trade which exposes an entruster on floor plan to certain risks, these are risks against which he

can guard by audits and accounting procedures or he can refuse to knowingly expose himself to the risk with the particular dealer. To fail to place the exposure of such risk with the entruster in such situation would make it impossible for retail finance companies to do business with any dealer unless the entruster were directly a participant. To hold otherwise, would expose the retail financer to a double loss as against at most a partial loss for both.' 56 Misc. 2d 261, [270], 288 N.Y.S.2d 525, 534.

'If this result exposes an inventory financer to certain risks, they are risks which he is in a better position to guard against than the retail financer.' (119 Ariz. 176, 178, 580 P.2d 8, 10.)

We fully agree with the reasoning of these courts. We believe that the risks involved in situations such as that at bar should be placed on the inventory financer, not only because it is better able to guard against those risks than the unwary buyer or the retail financer, but also because a contrary rule would inequitably allow the inventory financer a double recovery." 73 Ill. App. 3d 475, 480-81, 392 N.E.2d 344, 347.

One last matter deserves some comment: the question of waiver and whether Illinois recognizes such a doctrine. The security agreements in the instant case contained what is almost a standard provision: that "[w]ithout first obtaining the written consent of the Secured Party, the Debtor will not voluntarily, or permit any involuntary transfer of the Collateral or any interest therein by way of sale, creation of a security interest, levy or other judicial process."

Substantial evidence appears in the record indicating that the Bank knew it was financing a feeder pig inventory with a rapid turnover; among other things, over $3,700,000 had been deposited on a line of credit of $100,000; it not only made no objection, but apparently expected the same to occur. From this evidence, Webel argues that the Bank waived the requirement under the rationale of the leading case of *Clovis National Bank v. Thomas* (1967), 77 N.M. 554, 425 P.2d 726.

Courts of other jurisdictions have split widely, some (probably the minority) following *Clovis*, others following it, but with some modifications. Most commentators regard *Clovis* as the better rule. (See, e.g., Dolan, *Section 9—307(1): The UCC's Obstacle to Agricultural Commerce in the Open Market*, 72 Nw. U. L. Rev. 706 (1977).) Only one Illinois case, so far as we have been able to determine, has had occasion to comment on *Clovis: Vermilion County Production Credit*

*Association v. Izzard* (1969), 111 Ill. App. 2d 190, 249 N.E.2d 352. We do not interpret that case as either accepting or rejecting *Clovis*.

Since we hold that Webel was a buyer in the ordinary course of business of inventory and not of farm products and hence took free of the security interest under section 9—307(1), we need not decide the question of waiver and offer no opinion on it.

For all the foregoing reasons, the judgment of the circuit court of Pike County is affirmed.

Affirmed.

TRAPP and GREEN, JJ., concur.