### In the Matter of DARLING'S HOMES, INC., Debtor.

### GENERAL ELECTRIC CREDIT CORPORATION, a New York corporation, Movant,

v.

### Jonathan GAYL, Trustee.

**Bankruptcy No. 83–385.**
**Adv. No. M–83–25.**

United States Bankruptcy Court,
D. Delaware.

Feb. 13, 1985.

I. Barry Guerke, Dover, Del., for GECC.

James F. Waehler, J. Robert Hitchens, Georgetown, Del., for The Sussex Trust Co., The Farmers Bank of Willards, Rozena Adamson, Dorcilla C. Hammond and Wayne Taylor.

Marc Abrams, Wilmington, Del., for trustee.

James B. Tyler, III, Georgetown, Del., for Douglas R. Simpson, Jr.

Gerald I. Street, Dover, Del., for debtor.

## MEMORANDUM OPINION AND ORDER

HELEN S. BALICK, Bankruptcy Judge.

Debtor, Darling's Homes, Inc., was in the business of selling mobile homes on the retail level. General Electric Credit Corporation (GECC), Debtor's floor-plan inventory financer, filed a motion for relief from the automatic stay to proceed against its collateral—four mobile homes that were on Debtor's lot when it filed a Chapter 7 petition on October 28, 1983. The proceeding evolved by consent into a determination of priorities among various parties when Sus-sex Trust Company (STC), Farmers Bank of Willards (FBW) and four purchasers asserted their interests in the four units. STC had provided individual financing to Dorcilla C. Hammond and Rozena Adamson, who purchased mobile homes in June 1983. STC had also financed Douglas R. Simpson's purchase in October 1983. FBW had provided individual financing to Wayne Taylor in October 1982.

On December 22, 1981, GECC and Debtor executed a security agreement dated December 15, 1981 granting GECC a security interest in all of Debtor's inventory and proceeds. GECC perfected its security interest by filing a financing statement. The security agreement provided that when Debtor bought a mobile home from a manufacturer, GECC would advance the purchase price to the manufacturer. When the unit was sold to a retail purchaser, Debtor was required to promptly reimburse GECC the purchase price plus accrued interest and monthly carrying charges. Paragraph 3 of the security agreement provided:

3. So long as undersigned is not in default under any of its obligations to you hereunder or otherwise, undersigned shall have the right to sell all inventory financed by you in the normal course of its business and undersigned will notify you promptly of any sale of any item of such inventory and pay you therefore in accordance with paragraph 2 hereof.

Paragraph 7 provided that Debtor was in default if it failed to promptly pay any amounts due. Despite Debtor's failure to notify GECC of the sale of the four units, GECC had not formally declared Debtor to be in default prior to the filing of the petition.

GECC conducted regular inspections of Debtor's lot to ensure that Debtor was making payments when a unit was sold. If a unit was on the lot and GECC's representative was not informed by Debtor that it was subject to an agreement of sale, GECC assumed that the unit had not been

sold and Debtor was only required to pay monthly carrying charges. If a unit was not on the lot, GECC demanded full payment. GECC felt that these inspections provided protection of their interests by enabling them to demand payment shortly after a sale because units generally remain on a lot only seven to ten days after a sale until delivery can be arranged. However, Debtor's president testified that it was not unusual for a unit to remain on the lot for several months, as the units involved here did, if a purchaser was waiting for a site to be prepared or for various other reasons. Although Debtor kept records on each unit that would have contained purchase agreements had any existed, GECC's representative never inspected files to determine if a particular unit was subject to a contract of sale.

Debtor knew of GECC's inspection practices and their purpose and intended that GECC rely on the presence of the units to indicate that payment was not due on the unit. Upon inspection of the lot on October 6, 1983, GECC's representative noted the presence of the four units involved in this dispute and did not demand payment in full.

Debtor had an ongoing relationship with STC whereby STC provided financing to Debtor's customers. Debtor obtained the necessary information and transmitted it to STC who would verify the credit information and approve or deny credit. If approved, Debtor would prepare the Loan Contract on STC's preprinted forms which required disclosure of the amount of cash it received by way of down payment. The contract also provided for the purchaser to acknowledge that delivery of the unit had been made. Despite Debtor's representations on the STC forms, Debtor in fact received only partial down payments from Adamson and Hammond. Although Simpson paid a portion of his down payment with a post-dated check, it was cashed so that the balance of the down payment was paid in full prior to the bankruptcy filing. None of the units were delivered prior to the filing. STC was not informed of these facts and relied on the representations

made in the Loan Contract Forms. These provisions were important to STC because they ensured that purchasers had equity in the collateral for the loan.

STC was aware of GECC's interest as inventory financer of the mobile homes by virtue of the manufacturer's invoice noting that interest which the Debtor routinely sent with the Loan Contract on each unit. STC transmitted loan proceeds in the amount of the purchase price, less the stated down payment, to Debtor. STC also advanced the documentary and transfer fees to Debtor. These checks were made payable to Debtor and were deposited into its general account along with any down payment actually received.

Debtor did not pay GECC as required by the security agreement. GECC, believing the units to be unsold inventory, did not demand payment and did not send Debtor the manufacturer's certificate of origin. Debtor was required to obtain certificates of title reflecting STC's security interest in the mobile homes from GECC. STC never contacted GECC despite the fact that it had not received the certificates of origin or title required to perfect their security interests.

FBW financed Wayne Taylor's purchase of the fourth unit in October 1982. Mr. Taylor paid Debtor $1,000 of the $3,200 down payment and the proposed delivery date was "on request". Debtor was not involved in Mr. Taylor's financing arrangements as Taylor dealt directly with FBW. Taylor's financing was delayed and the unit identified in the agreement of sale by serial number was sold to another couple. Debtor ordered a replacement unit which Taylor testified was of almost identical style and quality. Debtor did not pay GECC for Taylor's unit although FBW transmitted the loan proceeds to Debtor in the amount of $13,500. FBW never received the certificates of origin or title for the unit, yet FBW never contacted GECC regarding the status of the unit.

The units subject to agreements of sale executed by Adamson, Hammond and Tay-

lor are still on the lot. Each of these purchasers made only partial down payments. The Trustee contends that these purchasers owe the balance of the down payment to the estate. Simpson made his down payment in full and removed the unit from Debtor's lot shortly after he received notice of the filing of Debtor's Chapter 7 petition.

GECC argues that the purported sales to the four purchasers do not defeat its security interest in the goods because they fail to qualify as buyers in the ordinary course of business and the alleged sales were unauthorized. GECC also asserts that the Taylor transaction did not extinguish its lien because the unit was not sufficiently identified to the contract. GECC contends that it is entitled to possession of the units and to dispose of them.

STC and FBW argue that Debtor was authorized to sell the units so that the purchasers take free of GECC's lien pursuant to 6 *Del.C.* § 9–306(2) or, in the alternative, that GECC's lien is extinguished under 6 *Del.C.* § 9–307(1) because the retail purchasers qualify as buyers in the ordinary course of business. STC and FBW also contend that the retail purchasers are entitled to take delivery of the units upon payment of any balance due on the down payment.

6 *Del.C.* § 9–306(2) provides:

(2) Except where this Article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof by the Debtor unless his action was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the Debtor.

STC, FBW and the four retail purchasers contend that GECC's security interest in the mobile homes was extinguished by the sale of the units because GECC's security agreement authorized the sale of the collateral in the ordinary course of business. GECC argues that the sales were unauthorized because Debtor was in default under the terms of the security agreement, al-though GECC took no formal action to declare default or to repossess the collateral prior to the filing of the Debtor's petition in bankruptcy.

■ Paragraph 3 of the security agreement specifically authorized the sale of the collateral. Furthermore, a secured party with a security interest in the inventory of a retail seller may be assumed to have authorized the sale of inventory to purchasers. *In re Mid-Atlantic Piping Products of Charlotte, Inc.*, 24 B.R. 314, 322 (Bankr. N.C.1982); *In re Gary Aircraft Corporation*, 681 F.2d 365, 373 (5th Cir.1982), cert. denied, —— U.S. ——, 103 S.Ct. 3110, 77 L.Ed.2d 1366 (1983); White and Summers, *Uniform Commercial Code*, § 25–14, p. 1070 (2d ed. 1980). Therefore, it appears that the sale of the four units was authorized and GECC's security interest in the collateral was extinguished but continues in any identifiable proceeds. However, GECC argues that the sales were unauthorized because of Debtor's default.

■ Although the terms of a security agreement are effective only between the parties to the agreement, they are effective against purchasers of the collateral in the context of protecting a security interest. *Get It Kwik of America, Inc. v. First Alabama Bank of Huntsville*, 361 So.2d 568 (Ala.Civ.App.1978). Debtor's failure to pay GECC did not render the sales unauthorized. An authorization to sell collateral may be made subject to conditions that must be met prior to the sale and until those conditions are satisfied, there is no authority to sell. *First National Bank v. Iowa Beef Processors*, 626 F.2d 764 (10th Cir.1980). However, the failure of a condition subsequent to the sale, such as a requirement that the proceeds must be paid to the secured party, does not prevent the authorization to sell from terminating the security interest at the time of the sale. *In re Ellsworth*, 28 B.R. 13, 16 (Bankr.App. Panel 9th Cir.1983), rev. on other grounds, 722 F.2d 1448 (9th Cir.1984). Therefore, Debtor's failure to pay GECC does not of itself invalidate the authorization to sell the collateral.

■ The failure to pay GECC does put Debtor in default under the terms of the agreement. However, even if Debtor's default invalidated the express authorization to sell the collateral granted in the agreement, the sales were authorized and GECC's security interests in the mobile homes were terminated by the sales. GECC did not take reasonable steps to protect its interests; thus, its inaction provided authorization for the sale of collateral. *In re Woods*, 25 B.R. 924, 930 (Bankr. Tenn.1982).

As pointed out by STC and the facts of this case, reliance on a Debtor's possession of inventory has its risks. An inventory check does not guarantee that a unit present on the lot is not subject to an agreement of sale, as these four units were. Pursuant to paragraph 5 of GECC's security agreement, GECC had the right to inspect Debtor's files and records and would have become aware that Debtor was receiving payment for the units and was not turning the funds over to GECC. The risk of loss in such situations should be on the lender rather than the retail purchaser. *Holstein v. Greenwich Yacht Sales*, 122 R.I. 211, 404 A.2d 842, 845 (1979).

Debtor was in the business of selling mobile homes and GECC, as its floor-plan financer, expected its collateral to be sold for Debtor was to repay GECC from the proceeds of the sales. GECC never inspected Debtor's files but simply relied on Debtor to pay when a unit was sold. GECC's monthly inspections provided minimal protection. GECC received checks which were returned due to uncollected funds months before the bankruptcy filing yet never investigated Debtor's business practices, never required two party checks, nor did GECC take any other steps to protect itself. GECC contends that it was unaware of the default until after the petition was filed, however, that is GECC's responsibility and risk, not that of purchasers who had every reason to believe that the dealer had authority to sell the units on the lot.

■ 6 *Del.C.* § 9–307(1) provides an exception to § 9–306(2) that cuts off a secured party's security interest if a buyer in the ordinary course of business purchases the collateral:

A buyer in ordinary course of business (subsection (9) of Section 1–201) * * * takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence.

A buyer in the ordinary course is defined as

a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind but does not include a pawnbroker. "Buying" may be for cash or by exchange of other property or on secured or unsecured credit and includes receiving goods or documents of title under a pre-existing contract for sale but does not include a transfer in bulk or as security for or in total or partial satisfaction of a money debt. 6 *Del.C.* § 1–201(9).

In order to qualify for protection under § 9–307(1), a purchaser must buy from a seller who is in the business of selling goods of the kind involved. *Martin Marietta Corp. v. New Jersey National Bank*, 612 F.2d 745 (3d Cir.1979). It is undisputed that Debtor was in the business of selling mobile homes at the retail level. In many cases, purchasers entitled to protection under this section have made a purchase from a retailer's inventory, which is subject to a security interest held by a floor-plan financer. *Balon v. Cadillac Automobile Company of Boston*, 113 N.H. 108, 303 A.2d 194 (1973). If purchasers were not afforded this protection, retail sales would be curtailed and the very purpose for financing the inventory would be defeated. 6 *Del.C.* § 9–307, Comment 1; *In re Gary Aircraft*, supra.

The buyer must also be a good faith purchaser. Title 6 of the Delaware Code provides two definitions of good faith:

first, "honesty in fact in the conduct or transaction concerned." 6 *Del.C.* § 1–201(19); secondly, "in the case of a merchant means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." 6 *Del.C.* § 2–103(1)(b).

■ The Article 2 provision does not apply to Article 9 disputes. Article 2 governs the rights and duties between buyers and sellers, whereas Article 9 governs the rights and obligations of buyers and secured creditors. *Sherrock v. Commercial Credit Corporation*, 290 A.2d 648 (Del. 1972). Absent an Article 9 definition of good faith, the Article 1 provision applies to Article 9 transactions. *Martin Marietta* at 752. Therefore to protect one's status as a buyer in the ordinary course, the purchaser must show honesty in fact.

■ The Third Circuit has held that good faith under § 9–307(1) is determined by the subjective standard; the buyer's state of mind controls. *Id.* To establish that a purchaser acted in good faith, he must show that he personally believed he was honest in what he did. Whether anyone else would have thought his action to be honest is irrelevant to the issue of good faith under the subjective standard. *Balon, supra.*

GECC argues that the four purchasers were not honest in fact because they knowingly made false representations to the banks, intending the banks to rely on that information in making the loans. It became apparent at trial that the four purchasers signed loan contracts misstating the amount of money actually paid to Debtor by way of down payment. They also indicated that they had taken delivery of the units although three of the units were still on Debtor's lot at the time of trial.

■ However, the purchasers did not believe that they were acting dishonestly. Although they were warned by the Debtor not to inform STC or FBW that they were paying the down payment in installments, they acted in good faith under the subjective standard. They relied on the Debtor's representations. Debtor may not have acted in good faith, but it is the good faith of the purchasers that must be established. The seller's honesty or dishonesty is not relevant to a purchaser's status as a buyer in the ordinary course of business.

GECC also contends that the four purchasers are not entitled to buyer in the ordinary course status because the four purchasers never took delivery of the mobile homes. Thus, its security interest has not been terminated because there was no "sale" due to the absence of delivery. GECC argues that it is the sale of goods to a buyer in the ordinary course of business that cuts off a secured party's security interest in the goods so that it is necessary to determine whether Debtor completed the sale of the four units to the purchasers. Noting the limited relevance of "title" under the Uniform Commercial Code (U.C.C.), STC, FBW and the purchasers argue that an individual is a buyer at the time the goods are identified to the contract, rather than at the time of delivery because the purchaser acquires a special property interest in goods at the moment of identification.

Under Delaware Law, "A 'sale' consists in the passing of title from the seller to the buyer for a price." 6 *Del.C.* § 2–106(1); *Autrey v. Chemtrust Industries Corp.*, 362 F.Supp. 1085 (D.Del.1973). 6 *Del.C.* § 2–401 governs passage of title. Under the U.C.C., the concept of title is generally irrelevant to a determination of the rights and duties of a buyer, seller and third parties because the drafters of the U.C.C. have provided detailed standards for resolving specific conflicts. 6 *Del.C.* § 2–401; 6 *Del.C.* § 2–101, Comment; 6 *Del.C.* § 9–102, Comment. However, passage of title rules are applicable to the determination of whether there has been a "sale" of goods.

Title to goods may pass at any time after their identification to the contract, in any manner and on any conditions explicitly agreed on by the parties. 6 *Del.C.* § 2–401(1). In the case at bar, there was no agreement between Debtor and purchasers

regarding passage of title. In situations in which delivery of the goods is to be made without moving the goods and the seller is required to deliver documents of title, title passes when he delivers such documents. 6 *Del.C.* § 2–401(3)(a). This subsection is not applicable here in light of debtor-seller's duty to deliver the mobile homes. Subsection 2 provides that if the parties do not provide for passage of title, it passes to the buyer at the time and place at which seller completes his performance with reference to the physical delivery of the goods. Debtor's agreement with the purchasers provided that the units would be delivered to purchasers' lots and "hooked up" by the Debtor (or his agent). Therefore under § 2–401(2), title would pass from Debtor to purchasers when they were installed on the particular lots.

Debtor never delivered the units to the retail purchasers so title never passed from the seller to the buyer under the applicable passage of title rules. Absent passage of title, there can be no sale under Delaware law.

There is a line of authority that focuses on "the ordinary course of business" rather than passage of title and states that a purchaser can be a buyer in the ordinary course without a completed sale. These courts have specifically rejected the argument that passage of title rules under Article 2 govern a determination of whether a purchaser is a buyer in the ordinary course under § 9–307(1). *Chrysler Credit Corporation v. Sharp*, 56 Misc.2d 261, 288 N.Y. S.2d 525 (1968); *Rex Financial Corporation v. Mobile America Corporation*, 119 Ariz. 176, 580 P.2d 8 (1978); *Herman v. First Farmers Bank of Miner*, 73 Ill. App.3d 475, 29 Ill.Dec. 787, 392 N.E.2d 344 (1979).

> Whether the buyer is a buyer in the ordinary course is not affected by whether there has been a completed sale or merely the making of a contract to sell, since the fact that title has not yet been transferred as between the dealer and the purchaser does not prevent the latter from being regarded as a buyer in the

ordinary course of business, insofar as the secured creditor is concerned, where the transaction between the dealer and the purchaser is ordinary or typical in the trade. Anderson, *U.C.C.* 2d, Vol. 1, § 1–201:25, citing *Sharp.*

Article 9 establishes a system for determining priorities among parties to a secured transaction. The purpose of Article 9 "is to provide a simple and unified structure within which the immense variety of present day secured financing transactions can go forward with less cost and greater certainty." Delaware Study Comment, 6 *Del.C.* § 9–101. To this end, the rights, obligations and remedies of the parties do not depend on location of title to the collateral. 6 *Del.C.* § 9–202. The purpose of § 9–307 is to protect a "buyer in the ordinary course of business". Absent this provision, a retail purchaser would be unable to make a purchase from a dealer's inventory without first investigating the dealer's inventory financer who would hold a superior interest in the property. This would complicate everyday transactions on the retail level and would create precisely the type of problems that the U.C.C. was designed to eliminate. The U.C.C. is to be liberally construed and applied to promote its underlying purposes and policies. 6 *Del.C.* § 1–102. Therefore, the technical passage of title rules under Article 2 should not be applied to defeat a purchaser's status as a buyer in the ordinary course.

Debtor arranged the financing of the units with STC and agreed to accept down payments in installments. Debtor also agreed to allow the units to remain on its lot until the purchasers were ready to take delivery. The buyers' reliance on Debtor's representations was justified and these four buyers are the very type of purchaser that § 9–307 was designed to protect. Allowing Article 2 passage of title rules to defeat these retail purchasers' status as buyers in the ordinary course would produce results in conflict with the express policy of the U.C.C. as stated in the comments to the various sections of the U.C.C.

The focus should be on whether the retail purchasers are "buyers" under § 9–307 rather than on whether title passed so as to complete a "sale". At the very least the retail purchasers executed contracts to purchase the mobile homes. They bought from a dealer of mobile homes. The technicalities of Article 2 passage of title rules should not defeat their status as buyers in the ordinary course under Article 9.

STC, FBW and the purchasers argue that they are entitled to buyer in the ordinary course status because under the U.C.C. an individual is a "buyer" once goods are identified to the contract. Under § 2–103(1) a buyer is a person who buys or contracts to buy. A buyer obtains special property interests in goods once they are identified to the contract. § 2–501. Identification to the contract is irrelevant to a determination of whether there has been a completed sale, which by definition requires passage of title. § 2–106. An individual may be a buyer but there may not be a completed sale under § 2–106. A person may be a buyer at the time of identification rather than delivery and such a buyer need not take delivery in order to be a buyer in the ordinary course. *Holstein v. Greenwich Yacht Sales, Inc.,* supra.

The cases cited by GECC in support of its contention that the purchasers are not entitled to protection under § 9–307 due to lack of a completed sale are not applicable. In *Troy Lumber Co. v. Williams,* 124 Ga. App. 636, 185 S.E.2d 580, 582 (1971) the court found that the plaintiffs had merely made a down payment on a "proposal" to buy an unspecified mobile home. They did not purchase or contract to purchase goods from the dealer. The court stated that plaintiffs may have properly claimed that they were § 9–307 buyers if they were attempting to enforce the contract of sale or defending their right to possession after having performed under the contract. Adamson, Hammond, and Taylor have, at a minimum, an executed contract for the sale of specified units. Simpson has fully performed under his contract and is seeking to enforce his right to possession.

The court in *Chrysler Corp. v. Adamatic Inc.,* 59 Wis.2d 219, 208 N.W.2d 97 (1973) determined that the purchaser was not a buyer in the ordinary course under the particular facts of that case. The court stated that the U.C.C. does not require the buyer actually take delivery in order to attain buyer in the ordinary course status. *Id.* at 106–107. The court in *In re Giles World Marketing, Inc.,* 29 B.R. 523, 524 (Bankr.D.Mass.1983) determined at the outset that it was not necessary to determine whether the purchaser was a buyer in the ordinary course in order to decide whether the buyer or the inventory financer was entitled to possession of the undelivered goods. Therefore, all of the cases cited by GECC are distinguishable from the facts in this case.

The *Herman, Rex* and *Sharp* courts have addressed the contention that if passage of title isn't necessary to buyer in the ordinary course status then the inventory financer will be subject to the risk that a security interest in a dealer's inventory will be defeated by those who have made payments on account and don't receive their goods. The *Herman* court noted that the inventory lender is better able to guard against such risks than an average buyer or retail financer. *Herman* 29 Ill.Dec. 787, 392 N.E.2d at 347. If such a usage of trade exposes the inventory financer to risks, he can guard against these risks "by audits and accounting procedures or he can refuse to knowingly expose himself to the risk with the particular dealer. To fail to place the exposure of such risk with the entruster in such situations would make it impossible for retail finance companies to do business with any dealer unless the entruster were directly a participant." *Sharp* 288 N.Y.S.2d at 534. This result would be in conflict with the U.C.C.'s purpose as set out in § 1–102(2)(a), (b) and (c).

The only measure that GECC took to protect against the risk presented by these facts was periodic lot checks, even after Debtor's checks were returned for non-sufficient funds. The inventory financer is the one who benefits from financing a dealer's inventory by way of interest and carrying charges. In such situations equi-

ty dictates that he bear the risk of loss as well. As mentioned before, the security agreement gave GECC the right to inspect Debtor's books and records. Such an inspection would have revealed the contracts of sale and Debtor's receipt of payment from STC and FBW, the retail financers for the four purchasers. An inventory financer should not prevail over innocent retail purchasers when they took only minimal steps to protect their interests.

GECC argues that its right to possession is superior to Taylor's claim because no contract exists between Taylor and Debtor for the sale of unit number 6011 due to the fact that it was not identified to the contract. 6 *Del.C.* § 2-501 governs the manner of identification of goods to a contract.

(1) The buyer obtains a special property and an insurable interest in goods by identification of existing goods as goods to which the contract refers even though the goods so identified are non-conforming and he has an option to return or reject them. Such identification can be made at any time and in any manner explicitly agreed to by the parties. In the absence of explicit agreement identification occurs

(a) when the contract is made if it is for the sale of goods already existing and identified;

(b) if the contract is for the sale of future goods other than those described in paragraph (c) when goods are shipped, marked or otherwise designated by the seller as goods to which the contract refers;

(c) when the crops are planted or otherwise become growing crops or the young are conceived if the contract is for the sale of unborn young to be born within twelve months after contracting or for the sale of crops to be harvested within twelve months or the next normal harvest season after contracting whichever is longer.

(2) The seller retains an insurable interest in goods so long as title to or any security interest in the goods remains in him and where the identification is by the seller alone he may until default or insolvency or notification to the buyer that the identification is final substitute other goods for those identified.

(3) Nothing in this section impairs any insurable interest recognized under any other statute or rule of law.

The purpose of § 2-501 is to determine the point in time when the buyer has an insurable interest in the goods or a special property interest. The general policy is to resolve all doubts in favor of identification. To require positive physical action by the seller before designation would be to return to the formalism that the Code tries to escape. *Martin Marietta Corp. v. N.J. National Bank,* supra.

All of the documents executed by Taylor relating to his purchase identify mobile home number 4811 as the unit he contracted to purchase. Debtor inserted the serial number in all applicable forms. It then sold unit 4811 to Mr. and Mrs. Coulbourne, received payment in full and made delivery. He ordered a substantially identical mobile home, unit number 6011, as a replacement and changed the serial number on Taylor's forms.

When Taylor executed the contract, he acquired a special property and insurable interest in unit number 4811 because the unit was existing and had been identified to the contract by virtue of the notation of the serial number. Although the unit now claimed by Taylor is not the one originally identified to the contract, Taylor has a special property and insurable interest in unit 6011 because Debtor was within its rights when it substituted 6011 for unit 4811 under 6 *Del.C.* § 2-501(2). Furthermore, Taylor was subsequently informed of the substitution and agreed that the units were substantially identical. Taylor acquired a special property and insurable interest in unit 6011 at the time it was substituted for unit 4811.

GECC cites *Simson v. Moon,* 137 Ga. App. 82, 222 S.E.2d 873 (1975) in support of its contention that Taylor has no claim to unit 6011. The facts in that case are materially different from the facts here. In *Simson,* the dealer sold the same truck to two different people, collected money from both and absconded. The two purchasers

were involved in the dispute over who was entitled to possession. This case is not instructive in the resolution of the dispute involved in the case at bar.

A contract exists as to unit number 6011 between Taylor and Debtor because Debtor had the right to substitute the goods under 6 *Del.C.* § 2–501(2). Therefore, Taylor is also a buyer in the ordinary course as previously discussed.

Despite Debtor's default, the sales were authorized and GECC's perfected security interests in the units were extinguished by sale to purchasers who qualify as buyers in the ordinary course of business and attached to identifiable proceeds. Consequently, each of the retail purchasers is entitled to possession of his unit, subject to the security interest of either STC or FBW, upon payment to the Trustee of the balance of his deferred down payment and his prorata share of insurance premiums paid by the Trustee. GECC shall deliver to the Trustee whatever documents are necessary to accomplish transfer of title to the purchasers and the perfection of STC and FBW's security interest. Since GECC's perfected security interest extends to identifiable proceeds, the Trustee in turn must pay to GECC the deferred down payments.