In re TACOMA BOATBUILDING
CO., Debtor.

CONTINENTAL ILLINOIS NATIONAL
BANK AND TRUST CO. OF CHICAGO,
et al., Plaintiffs,

v.

TACOMA BOATBUILDING
CO., et al., Defendants.

No. 92 Civ. 0127 (RO).

United States District Court,
S.D. New York.

Aug. 6, 1993.

Department of Justice, Civil Div., Washington, DC (Scott G. Williams, Tracy J. Whitaker, of counsel), for U.S.

Fried Frank Harris Shriver & Jacobson, New York, NY (Herbert P. Minkel, Jr., of counsel), for Continental Ill. Bank.

## OPINION

OWEN, District Judge:

This is an appeal from an order of the Bankruptcy Court, 129 B.R. 365 granting summary judgment to plaintiffs Continental Illinois National Bank and Trust Company of Chicago, and denying the cross-motion for summary judgment of the United States of America, on behalf of the Maritime Administration ("MARAD"), Department of Transportation, each of which laid claim to the proceeds of sale of two vessels being built by the Tacoma Boatbuilding Co. ("Tacoma") when it went bankrupt in 1985. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 158(a).

In 1980, Tacoma entered into a security agreement with Continental Illinois National Bank and Trust Company of Chicago, individually and as agent for certain other banks ("the Banks"), which the Banks perfected, giving them a security interest in its inventory. In 1981, Tacoma entered into two contracts with Apollo Company, L.P. ("Apollo") to construct two ocean-going incineration vessels, hereafter Apollo I and Apollo II. Tacoma, located in the State of Washington, was in the business of constructing high performance vessels. Except for different hull numbers given to the vessels and different delivery dates, the contracts for each vessel were identical. The contracts provided that the vessels were to be constructed according to detailed plans and specifications which were incorporated into the contracts. These vessels were to be the first of their type built in the United States, other known incineration vessels in the world having been conversions of vessels originally constructed for other purposes. The original price of each vessel was $31,630,000.

The contracts provided that title to each vessel was in Tacoma during construction. The contracts also expressly granted Apollo a security interest in the two vessels, in all parts, components, materials, supplies, and equipment and in Tacoma's interest in any contracts for provision of any such items. On October 20, 1982, Apollo and Tacoma filed a financing statement in the State of Washington perfecting such a security interest.

The Apollo contracts were dependent upon MARAD's guarantee of the bonds Apollo intended to sell to finance the purchase of the vessels. On October 26, 1982, MARAD agreed to guarantee $30,000,000 of bonds, and to guarantee additional obligations up to 75 percent of the costs of the vessels. As part of this guarantee Apollo agreed to repay MARAD any moneys expended by MARAD to honor its guarantees.

Also on October 26, 1982, MARAD and Apollo entered into a security agreement which granted to MARAD a security interest in Apollo's interest in the vessels and in the Apollo contracts. On October 20, Apollo and MARAD filed an assignment whereby Apollo assigned to MARAD its rights in its financing statement with Tacoma.

As part of MARAD's bond guarantee, counsel for Apollo issued an opinion letter which stated, *inter alia*, that no security agreements under the Uniform Commercial Code ("U.C.C.") covered the vessels except those in favor of MARAD. Attached to the opinion letter was an attested certificate of Tacoma's president that no security interests in the vessels were superior to Apollo's. These assurances were required by MARAD, and were relied upon by MARAD when it issued its bond guarantee.

On July 21, 1983, MARAD agreed to guarantee an additional $25,875,000 in bonds. Also on this date Apollo's counsel and the president of Tacoma declared again that the Apollo vessels were free of liens or other encumbrances except for those in favor of MARAD. MARAD again relied upon these assurances.

As a result of these funding agreements, MARAD guaranteed $55,875,000 of bonds. Apollo provided an additional $18,625,000 for the purchase of the vessels plus $7,623,062 in working capital.

On January 1, 1985, At–Sea Incineration ("ASI") purchased all of Apollo's right, title and interest in the Apollo vessels, the construction contracts and the security agreement with Tacoma. At this time, the

contract price for Apollo I was raised to $36,172,182 and the contract price for Apollo II was raised to $37,417,622. MARAD agreed to allow ASI to issue an additional $4,000,000 in guaranteed bonds, bringing to $59,875,000 the total amount of MARAD-guaranteed bonds issued for the construction of the Apollo vessels.

The construction contracts, as revised, provided that Tacoma was to deliver Apollo I by March 31, 1985. Tacoma failed to meet this deadline, and MARAD, Tacoma and ASI negotiated a revised delivery date of September 21, 1985. Tacoma had submitted a Builder's Certificate to the Coast Guard in March 1985 in which it stated Apollo I was completed in 1985. Upon Tacoma's application and based upon information supplied by it, the Coast Guard issued a Certificate of Documentation for Apollo I which listed ASI as the owner.

However, by September 1985 Tacoma was suffering severe financial difficulties and construction on both Apollo vessels ceased, with no expectation of resumption by Tacoma. At that time, Apollo I was essentially complete and Apollo II was 85.-65% complete. Thereafter, on September 19, 1985, Continental, Tacoma's inventory financier, withdrew Tacoma's authority to sell inventory in the ordinary course of business. At that time, ASI and MARAD learned of Continental's action and also learned that Continental claimed a prior lien on the vessels. On September 23, 1985, Tacoma filed its chapter 11 petition. If Continental had not intervened, Apollo I would have been delivered on or about September 21, 1985.

In their original and restated security agreements, Tacoma and Continental agreed that Tacoma could in the ordinary course of business sell, lease or furnish under contracts of service any of its inventory. At the time Apollo entered into the construction contracts with Tacoma, it was unaware that Continental claimed a security interest in the subject matter of the contracts, i.e., the materials and later the constructed ships themselves. When ASI took over all of Apollo's interest in the vessels, it too was unaware that Continental claimed such a security interest.

As of September 13, 1985, Tacoma had been paid virtually the entire cost of the Apollo vessels. As to Apollo I, only $445,-000 out of $36,172,181 remained to be paid and as to Apollo II only $5,600,000 out of $37,417,622 remained to be paid.

On November 18, 1985, MARAD paid the indenture trustee, the National Bank of Washington, $59,390,000 in principal and $4,389,891.67 in accrued interest under the bond guarantee.

Both vessels were later sold, Apollo II on November 23, 1988, for $3,200,000, and Apollo I on February 9, 1989, for $4,000,-000. The proceeds of the sales are in escrow pending the resolution of this dispute.

In November, 1985, an adversary proceeding was commenced by the Banks seeking a declaration that their security interest had priority over the security interests of ASI's successor MARAD. MARAD asserted that it was a buyer in the ordinary course of business ("BIOC") under Section 1–201(9) of the U.C.C., and its interest therefore took priority over that of the Banks. The BIOC defense had, however, not been pleaded and leave to amend being denied, the Bankruptcy Court granted summary judgment to the bank defendants. The affirmance by this Court was, however, reversed by the Second Circuit, holding that MARAD was entitled to assert such a defense, *United States v. Continental Illinois National Bank and Trust Co.*, 889 F.2d 1248 (2d Cir.1989), but otherwise taking no position on the merits.

On remand, the Bankruptcy Court ruled that MARAD's BIOC defense failed as a matter of law, because the Tacoma contracts were rejected on November 3, 1986, and accordingly the contracts were not complete, title did not pass and no sale took place, leaving MARAD in the position of a general creditor. The Bankruptcy Court accordingly granted the Banks' motion for summary judgment and denied MARAD's cross-motion for summary judgment.

MARAD contended before the Bankruptcy Court and now before this Court that

ASI took the Apollo vessels free of Continental's lien prior to Tacoma's bankruptcy filing, either by taking legal title under the title-vesting clause of the construction contracts,[1] and/or by becoming a BIOC under the U.C.C.. MARAD contends that the Bankruptcy Court was in error in concluding that Tacoma's rejection of any executory portions of the contracts destroyed the BIOC claim, for MARAD contends that its rights had theretofore vested, title having already passed to ASI under U.C.C. 9–307(1) by the time of Tacoma's bankruptcy.

▆▆▆ MARAD's BIOC argument is based on two distinct foundations: the Continental–Tacoma security agreement, and the U.C.C., and depend on whether title to one or both of the Apollo vessels passed from Tacoma to ASI prior to Tacoma's bankruptcy filing. If title had vested in ASI prior to the filing, then ASI was a BIOC and took free of Continental's lien under the Continental–Tacoma security agreement,[2] since Continental had authorized sales of goods out of Tacoma's inventory, free of Continental's inventory lien. Further, MARAD contends that U.C.C. 9–306(2) divests Continental of its security interest where "the disposition was authorized by the secured party in the security agreement or otherwise." Thus, MARAD argues, the sale of the vessels from Tacoma to ASI was complete before the bankruptcy, even if performance under either Apollo contract was not fully complete. U.C.C. § 2–106(1) defines sale as "passing of title from the seller to the buyer for a price" (Incorporated into Article 9 of U.C.C. by § 9–105(3)). Section 2–401(1) declares that "title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties." Thus, the passage of title does not require a completed contract, as to which, MARAD contends, the Bankruptcy

Court was in error. ASI was also a BIOC under the U.C.C.. U.C.C. § 1–201(9) defines BIOC as "a person who is good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind." Further, a BIOC so defined takes free of a security interest created by the seller even if that security interest is perfected, and even if the buyer knows of its existence. U.C.C. § 9–307(1).

Viewed against the above, at the time Apollo I became deliverable, Continental's security agreement permitted the sale of the Apollo vessels, and Apollo, ASI and MARAD had no knowledge of a violation of Continental's security interest. ASI, accordingly, was a buyer in the ordinary course of business. Nor is this status defeated by any insignificant lack of completion, for a buyer is defined in the U.C.C. as "a person who buys *or contracts to buy* goods." U.C.C. § 2–103(1)(a) (emphasis added).

Apollo I was in deliverable condition by September, 1985 at the time of Tacoma's bankruptcy filing. While the title-vesting provision of the Apollo contracts states that during construction, title to a vessel is in Tacoma, conversely, once construction by Tacoma stopped, even under these unanticipated circumstances, Tacoma could no longer claim title, and it passed to the buyer. Indeed, Tacoma had agreed to deliver the vessel on September 21, 1985, the Coast Guard had earlier issued a Certificate of Documentation for Apollo I identifying ASI as the vessel's owner, and Tacoma had completed the Builder's Certification stating that the vessel was completed. These documents establish prima facie evidence of ownership, and should be given added weight when the party generating

---

1. Each construction contract provided that "Title to the Vessel shall vest in Contractor during construction." As noted, construction had stopped on both vessels by September 1985, with no intention of resumption by Tacoma.

2. The 1980 security agreement between Continental and Tacoma, and the restatement of that agreement in 1982, both provided: "Until such

time as the Agent shall notify the Company of the revocation of such power and authority, the Company (a) may, in the ordinary course of its business, at its own expense, sell, lease or furnish under contracts of service any of the Inventory normally held by the Company for such purpose...."

the documentation, Tacoma, concedes title has transferred elsewhere. *Chase Manhattan Financ. Servs., Inc. v. McMillian*, 896 F.2d 452, 460 (10th Cir.1990); *St. Paul Fire & Marine Ins. Co. v. Vest Transp. Co., Inc.*, 666 F.2d 932, 938 (5th Cir.1981). Finally, Tacoma conceded in its answer that it sold the Apollo vessels pursuant to the Apollo contracts and as authorized by the Continental–Tacoma security agreement.

The foregoing finds additional support in the fact that courts treat identification to the contract as sufficient for BIOC status. *See, e.g., Daniel v. Bank of Hayward*, 144 Wis.2d 931, 425 N.W.2d 416, 417 (1988); *In the Matter of Darling's Motor Homes, Inc.*, 46 B.R. 370 (Bankr.D.Del.1985). A purchaser who received neither delivery or title has nevertheless been determined to be a BIOC. *Jones v. One Fifty Foot Gulfstar*, 625 F.2d 44, 47 n. 3 (5th Cir. 1980); *Martin Marietta Corp. v. New Jersey Nat. Bank*, 612 F.2d 745 (3d Cir.1979). Whether "goods" are "identified" to the contract so that one purchasing them is a BIOC under § 9–307(1) is determined by § 2–501[3], whose purpose is to fix the point at which the buyer has a property interest in the goods. The general policy "is to resolve all doubts in favor of identification. To require positive physical action by the seller before designation would be to return to the formalism that the Code tries to escape." *Darling's Homes*, 46 B.R. at 379. The Apollo vessels, which were obviously not in existence at the time the contract was signed in December 1981, were future goods falling within the purview of § 2–501(1)(b). The vessels were made according to detailed specifications approved by Tacoma, Apollo and MARAD. The parts were specifically ordered for the vessels, and were either already marked when received or were marked by Tacoma employees with the contract number in order to be used on the vessels. Apollo I and Apollo II were themselves identified by the numbers painted on their hulls and specified in the original construction contracts. The risk of loss should be on the lender rather than the retail purchaser. *Darling's Motor Homes*, 46 B.R. at 375.

■ The inquiry does not end here, however, for the definition of "goods" must be addressed. Research has not disclosed authorities defining the term "goods". The term does not, however, seem reasonably applicable to parts of to-be-completed objects. The U.C.C. § 2–501(1)(b) defines "future goods" as being identified "when goods are shipped, marked or otherwise designated ..." The use of the word "goods" in both clauses indicates that the shipping, marking or designating is to occur on the future goods once they are completed, rather than on the parts as they are in the course of assembly. Apollo I, which was finished and deliverable had, the Court concludes, become identified to the contract and therefore became "goods" to which U.C.C. § 2–501(1)(b) refers. Apollo II, however, was still an incomplete vessel, and therefore in the Court's view, did not qualify as "goods", and hence was not entitled to BIOC protection.

■ Illinois, whose laws govern the Continental–Tacoma security agreement, and New York, whose laws govern the construction contracts, are in accord. Indeed, it is Illinois law that goods do not even need to be specifically identified to a contract for BIOC protection. *Wilson v. M & W Gear*, 110 Ill.App.3d 538, 66 Ill.Dec. 244, 247, 442 N.E.2d 670, 673 (1982). When a contract to buy goods is executed, the purchaser is a BIOC within the meaning of § 9–307 even while the goods are in the dealer's inventory awaiting delivery or being prepared for delivery. The passage of title is "immaterial to the protections afforded to a buyer in the ordinary course of business." *Wilson*, 66 Ill.Dec. at 246–47, 442 N.E.2d at 672–73.[4] *See also, Farmers State Bank v. Webel*, 113 Ill.App.3d 87, 68

---

**3.** Under § 2–501, identification occurs

a) when the contract is made if it is for the sale of goods already existing and identified; (b) if the contract is for the sale of future goods other than those described in para-

graph (c), when goods are shipped, marked or otherwise designated by the seller as goods to which the contract refers...."

**4.** The Comments to the Illinois Code note: "This section de-emphasizes whatever signifi-

Ill.Dec. 619, 623–24, 446 N.E.2d 525, 529–30 (1983); *Finance America Commercial Corp. v. Econo Coach, Inc.,* 118 Ill.App.3d 385, 73 Ill.Dec. 878, 454 N.E.2d 1127 (1983).

New York law also rejects title as determinative of when a buyer becomes a BIOC. *See Chrysler Credit Corporation v. Sharp,* 56 Misc.2d 261, 288 N.Y.S.2d 525, 529 (1968); *see also, Tanbro Fabrics Corp. v. Deering Milliken, Inc.,* 39 N.Y.2d 632, 385 N.Y.S.2d 260, 350 N.E.2d 590 (1976).

Because MARAD had become a BIOC with respect to Apollo I by September 1985 before Tacoma filed for bankruptcy, MARAD is entitled to the proceeds from the sale of Apollo I. The Court concludes that the Bankruptcy Court was in error in holding that MARAD lost this vested status because of Tacoma's rejection of any unexecuted portions of the contracts over a year later in November 1986. Accordingly, the Bankruptcy Court's order granting summary judgment to Continental is reversed as to the proceeds of the sale of Apollo I, and affirmed as to the disposition of the proceeds of the sale of Apollo II. The proceeding is accordingly remanded to the Bankruptcy Court with directions to grant MARAD's cross-motion for summary judgment seeking the proceeds of sale of Apollo I, and is otherwise affirmed.

cance the concept of 'title' may have had under pre-Code chattel security law.' " *Wilson,* 66 Ill. Dec. at 247, 442 N.E.2d at 673, *citing* Ill.Ann. Stat., ch. 26, par. 9—202, Illinois Code Comment, at 103 (Smith–Hurd 1974).