FINANCE AMERICA COMMERCIAL CORPORATION, Plaintiff-Appellant, *v.* ECONO COACH, INC., Defendants—(William H. Herchenbach *et al.*, Interpleaders-Appellees).

Second District   No. 82—750

Opinion filed September 30, 1983.

Steven J. Teplinsky, Joel A. Haber, Alvin D. Meyers, and Gary H. Smith, all of Berman, Fagel, Haber, Maragos and Abrams, of Chicago, for appellant.

George E. Downs, of Palatine, for appellees.

JUSTICE HOPF delivered the opinion of the court:

This case is before us for the second time. See *Finance America Commercial Corp. v. Econo Coach, Inc.* (1981), 95 Ill. App. 3d 185, 419 N.E.2d 935.

In April 1978 plaintiff, Finance America Commercial Corporation (Finance) filed an action against defendants seeking, among other things, a judgment for immediate possession of 17 recreational vehicles which were pledged as security for loans made to defendants pursuant to an inventory loan agreement. In February 1979, Arthur Frey, Donald Gable and William Herchenbach (Intervenors) filed a petition to interplead, alleging that during 1977 they each had purchased recreational vehicles from certain of the defendants; that certain of the defendants represented to interpleaders that they would

forward the certificates of origin for the vehicles to the Illinois Secretary of State for issuance of the titles in interpleaders' names; that certain of defendants titled said vehicles in the name "Econo-Coach, Inc." in the State of Florida; and, that the titles were then pledged by certain of the defendants as security for loans from plaintiff. Plaintiff thereafter filed a motion for summary judgment against defendants which was granted by the court. In January 1980, plaintiff filed a motion for summary judgment against interpleaders and interpleaders filed an answer thereto. Summary judgment was entered in plaintiff's favor against interpleaders in April 1980. Thereafter, two of the interpleaders, Herchenbach and Gable, appealed from the order granting summary judgment and from a June 1980 order denying their petition for reconsideration. In September 1980, Finance repossessed the two vehicles in Herchenbach's possession and sold them at an auction for a total of $16,100.

In our previous opinion, we noted initially that Herchenbach and Gable were in fact intervenors within the meaning of section 26.1 of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 26.1, now codified at Ill. Rev. Stat. 1981, ch. 110, par. 2—408) rather than interpleaders (Ill. Rev. Stat. 1979, ch. 110, par. 26.2, now codified at Ill. Rev. Stat. 1981, ch. 110, par. 2—409). (*Finance America Commercial Corp. v. Econo Coach, Inc.* (1981), 95 Ill. App. 3d 185, 186, 419 N.E.2d 935.) We will therefore refer to them in this appeal as Intervenors. In the initial appeal, we ultimately reversed and remanded the cause because there existed a genuine issue of material fact as to whether Intervenors were buyers "in ordinary course of business" so as to be entitled to the protection afforded to purchasers under section 9—307(1) of the Uniform Commercial Code. 95 Ill. App. 3d 185, 187, 419 N.E.2d 935; Ill. Rev. Stat. 1979, ch. 26, pars. 1—201(9), 9—307(1).

Upon remand, both Intervenors and Finance moved for summary judgment, and both motions were denied. The cause proceeded to trial and after hearing the evidence and arguments of counsel, the trial court held that Intervenors were buyers "in ordinary course of business." Plaintiff was ordered to turn over the title of the recreational vehicle in Gable's possession to Gable, and to pay Intervenor Herchenbach the value of the two vehicles it had repossessed from him and subsequently sold. Finance appeals, raising the following issues for review: (1) whether Intervenors sustained their burden of proving they were buyers "in ordinary course of business"; and, (2) whether the trial court's finding as to the value of the property sold by Finance was against the manifest weight of the evidence.

■■ ■ Before considering the questions presented for review, we first turn our attention to the inventory loan agreement upon which Finance bases its claim to the recreational vehicles in question. After examining the language contained in the agreement, we conclude that Finance contemplated there might be sales of the recreational vehicles which were used as inventory collateral. The agreement does not specifically prohibit the sale of the vehicles but rather creates a security interest on Finance's behalf in "all of the Collateral and *** the proceeds thereof covering Inventory." "Collateral" is defined under the agreement as including inventory (*i.e.,* motor homes or coaches), proceeds and receivables. "Proceeds," under the agreement, means "all cash received by the Borrower upon the *sale or lease* of Inventory, together with all Receivables of Borrower arising out of the *sale or lease* of Inventory." (Emphasis added.) Further, the agreement specified that Econo Coach was to pay the "unpaid balance of any loan or advance plus accrued interest outstanding and applicable to any item of Inventory sold by Borrower." Thus, the inventory loan agreement clearly contemplated the possibility of the sale of the motor coaches, and provided for a continuing security interest in the proceeds resulting from such sale. (See also Ill. Rev. Stat. 1979, ch. 26, par. 9—306.) We therefore conclude that Econo Coach's sale of the coaches to Intervenors was an authorized sale under sections 9—201 and 9—306(2) of the Uniform Commercial Code and that Finance is estopped from asserting a continuing security interest in the motor coaches. (Ill. Rev. Stat. 1979, ch. 26, pars. 9—201, 9—306(2); *Massey-Ferguson, Inc. v. Helland* (1982), 105 Ill. App. 3d 648, 654-55, 434 N.E.2d 295; *Bitzer-Croft Motors, Inc. v. Pioneer Bank & Trust Co.* (1980), 82 Ill. App. 3d 1, 9-15, 401 N.E.2d 1340; *Draper v. Minneapolis-Moline, Inc.* (1968), 100 Ill. App. 2d 324, 241 N.E.2d 342.) Intervenors therefore acquired the coaches free and clear of any security interest in them without regard to their status as "buyers in ordinary course." *Massey-Ferguson, Inc.; Bitzer-Croft Motors, Inc.; Draper.*

■■ In any event, we find no error in the trial court's determination that Intervenors were buyers "in ordinary course of business" within the meaning of section 1—201(9) of the Uniform Commercial Code. (Ill. Rev. Stat. 1979, ch. 26, par. 1—201(9).) That section states:

> " 'Buyer in ordinary course of business' means a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind ***."

In *American National Bank & Trust Co. v. Mar-K-Z Motors & Leas-*

*ing Co.* (1974), 57 Ill. 2d 29, 33, 309 N.E.2d 567, our supreme court held that whether one is a "buyer in ordinary course of business" and whether one is a "person in the business of selling goods of that kind" are questions of fact for the trial court. Thus, the trial court's findings on these factual issues will not be disturbed unless they are contrary to the manifest weight of the evidence. (57 Ill. 2d 29, 33, 309 N.E.2d 567.) We believe there is sufficient evidence here to support the trial court's finding.

In the instant case, there is no question that Intervenors both purchased their respective recreational vehicles in good faith and without knowledge of Finance's security interest in them. Thus, an analysis of this issue turns upon whether sufficient evidence exists that Econo Coach was "in the business of selling goods of that kind." As previously noted, the security agreement itself contemplated that the motor coaches might be sold by Econo Coach and that in that event Finance's security interest would continue in the proceeds of such sales. This supports the trial court's finding that one aspect of Econo Coach's business was the sale of its inventory vehicles. (*Cf. Hempstead Bank v. Andy's Car Rental System, Inc.* (1970), 35 App. Div. 2d 35, 312 N.Y.S.2d 317.) It was also demonstrated at trial that the Intervenors purchased the vehicles from an inventory of coaches situated on the Econo Coach lot and at a nearby garage, that other people were also discussing sales with someone from the company, and that Herchenbach knew of 17 other sales by Econo Coach and knew three of them personally. In addition, the trial court below noted the prevalent practice among leasing agencies of selling their previously leased vehicles after a certain period of time. Under all of these circumstances, we believe that the trial court's finding that Intervenors were "buyers in ordinary course of business" was not against the manifest weight of the evidence.

■ We reach this result despite the fact that Econo Coach's annual report to the Secretary of State states only that it was in the business of leasing recreational vehicles. While this fact is probative of the nature of defendants' business, it is not as conclusive as the articles of incorporation would have been. (*Cf. American National Bank & Trust Co. v. Mar-K-Z Motors & Leasing Co.* (1973), 11 Ill. App. 3d 1046, 1048, 298 N.E.2d 209.) Nor do we consider as dispositive the fact that the sign outside Econo Coach's facility and its business card refer only to the rental of vehicles and not their sale. While these facts indicate the primary business of Econo Coach was the rental of vehicles, they do not necessarily negate the trial court's finding that the company was also legitimately engaged in the sale of such vehi-

cles. This is especially true in light of the security agreement between Econo Coach and Finance which clearly contemplated that such sales might be made within the course of Econo Coach's business. Moreover, the imposition upon Intervenors to inquire into the existence of a security interest would serve no purpose here where the security interest in question did not even exist at the time of purchase.

■ Finance also attempts to avoid our result by claiming that Intervenor Herchenbach did not purchase his vehicles "in ordinary course" because the purchases were subject to a leaseback arrangement whereby Econo Coach would act as Herchenbach's agent in leasing the coaches to others. Herchenbach did not take possession of the vehicles, nor did he obtain the keys. We view this arrangement, which occurred contemporaneously with Herchenbach's payment of full value for the vehicles, as largely irrelevant to the question whether the initial purchase was "in ordinary course." It is not the actual delivery of goods to the purchaser that is the critical factor in determining whether a purchase is "in ordinary course." Rather, the question is whether the transaction between the buyer and seller was "customary in the business" and whether the buyer was "a typical buyer in an ordinary business transaction" with the seller. (*Herman v. First Farmers State Bank* (1979), 73 Ill. App. 3d 475, 479, 392 N.E.2d 344.) For the reasons previously stated, we believe Herchenbach's purchase of the vehicles was customary in Econo Coach's business.

■ Finance next asserts that the trial court's award of $38,000 to Herchenbach was against the manifest weight of the evidence. It contends the only evidence of value on the two vehicles was the expert testimony of Mr. Gordon, the auctioneer who sold the vehicles at a public sale on December 11, 1980, for a combined total price of $16,100. We disagree.

A party seeking to recover has the burden not only to establish that he sustained damages but also to establish a reasonable basis for computation of those damages. (*Schoeneweis v. Herrin* (1982), 110 Ill. App. 3d 800, 808, 443 N.E.2d 36.) Damages may not be awarded on the basis of speculation or conjecture. (*Schoeneweis.*) However, a reviewing court will not disturb the trial court's findings as to damages unless these findings are manifestly against the weight of the evidence. (*Schoeneweis.*) The finding of the trial court here has ample support in the record.

In the instant case, Herchenbach testified, without objection, that at the time Finance picked up the coaches, the Eleganza model was worth between $30,000 and $35,000, and the Jimi Mini model was worth between $8,000 and $12,000. He testified at that time they

were both in good condition. The Eleganza had 45,000 miles on it, and the Jimi Mini had 35,000 miles. He also testified that through his research of the vehicles, he learned that the Eleganza had increased in value since the time it was taken because it was a discontinued model and that at the time of trial it was worth about $40,000. The vehicle's appreciation was verified by Mr. Winslow, testifying as an expert for Herchenbach, who stated that at the time of trial the vehicle could sell for as high as $35,000. Winslow examined the Eleganza in question in 1980, prior to its return to Finance, and stated it was in excellent condition and had a value at that time of between $26,000 and $28,000. At the time of trial, if it were in the same condition as it was in 1980, it would be worth about $32,000. Winslow also testified the Jimi Mini model at the time of trial was worth approximately $10,000, and they originally sold for between $16,000 and $17,000. He further testified that mileage is of little significance on a motor home.

Although at the time of trial Herchenbach believed the vehicles were taken from him in June 1980, it was subsequently learned that in fact he retained possession of the vehicles until at least September 1980. Thus, plaintiff hypothesizes that during this three-month period the vehicles drastically reduced in value due to increased deterioration over the summer rental season. Plaintiff essentially contends this would explain Gordon's appraisal of the Eleganza at only $12,000 to $13,000, and the Jimi Mini at between $4,300 to $4,500. However, Intervenors correctly note, as did the trial court, that the period of time between September 1980, and the sale in December 1980, was also unaccounted for, and such deterioration could have therefore taken place in this period when the vehicles were in the hands of Finance. In any event, it is clear that the plaintiff's claim regarding the condition of the vehicles at the time of repossession was controverted.

The testimony of an expert witness as to the value of the collateral is subject to the trier of fact's evaluation of credibility. (*A. A. Store Fixture Co. v. Kouzoukas* (1980), 87 Ill. App. 3d 631, 635, 410 N.E.2d 131.) The trial court expressly recognized this principle of law and found Intervenors' witnesses, particularly Winslow, to be more credible than Gordon. The court found Winslow's testimony regarding value to be more accurate and reliable because he was in the business of managing a large retail recreational vehicle operation in the same area in which the vehicles were originally sold. The auctioneer, on the other hand, sold many different items, and the vehicles were auctioned outside the Chicago metropolitan area. The court further noted that Gordon himself admitted the price he received for the Jimi Mini was under full value.

Plaintiff argues that the trial court erroneously believed it did not have authority to enter a judgment in a lesser amount. It bases its argument upon the trial court's comment that "I don't like the $38,000 figure." However, this comment was ambiguous and made in the context of a general comment that the court realized both parties involved were innocent parties. The court also specifically found the auctioneer to be incredible; thus, it did not wish to consider his testimony in arriving at some kind of compromise. The court clearly understood that damages must be based upon something more than mere speculation, and that based upon the only credible evidence presented, the $38,000 figure was the most reasonable. The finding of the court is supported by the record and will not be disturbed.

Accordingly, the judgment of the circuit court of Lake County is affirmed.

Affirmed.

NASH and LINDBERG, JJ., concur.